KAREN P. HEWITT
United States Attorney
MELANIE K. PIERSON
Assistant U.S. Attorney
California State Bar No. 112520
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-5685/(619) 557-7055(Fax)
Email: Melanie.Pierson@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>    v.<br><br>JAMES FOLSOM,<br><br>           Defendant. | Criminal Case No. 08CR1092-JAH<br><br>DATE:  June 16, 2008<br>TIME:  9:00 a.m.<br><br>GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS:<br><br>(1) FOR DISCOVERY;<br><br>(2) TO FILE FURTHER MOTIONS<br><br>TOGETHER WITH STATEMENT OF THE CASE; STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES |

I

STATEMENT OF THE CASE

On October 15, 2007, a misdemeanor Information was filed in Criminal Case No.07CR2852-JAH, charging defendants James Folsom and Gabino Palafox with Conspiracy, in violation of Title 18, United States Code, Section 371, and Introduction into Interstate Commerce of Unapproved Medical Devices, in violation of Title 21, United States Code, Sections 331(a) and 333(a)(1) and 351(f). On October 27, 2007, defendant Folsom appeared pursuant to a Notice to Appear with counsel Carlos Negrete and continued the date of his arraignment until November 29, 2007, when Folsom again appeared and entered a plea of not guilty.

On March 6, 2008, codefendant Gabino Palafox pled guilty to the misdemeanor charge of Introduction into Interstate Commerce of Unapproved Medical Devices, and was sentenced to one year of probation and a $250 fine. On March 7, 2008, the Government filed a motion to obtain a handwriting exemplar from defendant Folsom.

On April 8, 2008, a federal grand jury charged defendant James Folsom in Criminal Case 08CR109-JAH with twenty felony charges including one count of Conspiracy, in violation of Title 18, United States Code, Section 371; seven counts of Introduction of an Adulterated Device into Interstate Commerce, in violation of Title 21, United States Code, Sections 331(a), 333(a)(2) and 351(e) and (f); seven counts of Introduction of a Misbranded Device into Interstate Commerce, in violation of Title 21, United States Code, Sections 331(a), 333(a)(2), 352(o), 352(b) and 360(j) and (k); five counts of Failure to Register a Device Establishment, in violation of Title 21, United States Code, Sections 331(p), 333(a)(2) and 360; and with the Commission of an Offense While on Pretrial Release, in violation of Title 18, United States Code, Section 3147. On April 11, 2008, defendant Folsom was arraigned on this Indictment and the Information in Criminal Case 07-CR-2852-JAH was dismissed. On that date, the court granted the Government's motion to obtain a handwriting exemplar, and set a date for a hearing on all motions for May 12, 2008. On May 12, 2008, defense counsel filed a motion to compel discovery and the court continued the date for a hearing on all motions until June 15, 2008, to give defense counsel time to prepare.

II

STATEMENT OF FACTS

James Folsom makes his living selling a Rife-style biofrequency device not approved by the FDA. Folsom, using the alias Jim Anderson, falsely represented that his devices could be marketed as an investigational device. Folsom manufactured the devices in his garage and shipped them to customers throughout the United States.

In the 1950's, a now deceased scientist in San Diego named Royal Raymond Rife invented a device he claimed could cure all diseases by using harmonic frequencies to cause cell walls to shatter. The device itself (as sold by defendant Folsom) consists of a small box which plugs into the wall, which has a digital readout and a keypad. The device also has two ports into which plugs attached to metal

plates or metal cylinders can be inserted. Using the keypad, the user is instructed to punch in the number for the frequency for the condition they wish to treat, for example, 100 to treat AIDS, or 102 for diabetes, or 205 for cancer. The plates or cylinders are placed on the body part in question, allowing the electronic frequencies to pass through the body. Folsom sells this device, which costs about $350 to manufacture, for $1,500-$2,000.

While the medical effectiveness of such a device has never been proven (or approved for use on humans to treat diseases by the U.S. Food and Drug Administration "FDA"), many such Rife-style devices are still marketed (illegally) today. One such marketer was a woman named Kim Bailey of Fallbrook, who in 1997 patented a Rife-style device under the name BioSolutions. While under investigation for the sale of unapproved devices, Bailey committed the crime of murder for hire, for which she is currently serving a life sentence.

Bailey employed a number of people to assist her in her endeavor, including defendant Folsom, Bruce Perlowin, Gabino Palafox, and John Krueger. All employees of Bailey who had contact with customers were required to use false names. "Jim Anderson" was identified as the false name used by defendant Folsom. Bailey was arrested in late 1999 in the murder for hire case, and has never been released from custody. As Bailey lost control of the business, the operation fragmented. Krueger and a partner, Mark Adams, began manufacturing machines on their own (under the labels AstroPulse, Naturetronics and BioSolutions), while Perlowin began manufacture his version of Bailey's machine, under the name Energy Wellness. Defendant Folsom, in tandem with Gabino Palafox, began manufacturing and marketing another version of Bailey's machine, under the labels AstroPulse, Naturetronics, BioSolutions and Global Wellness. Krueger, Adams, Perlowin and Palafox have all pled guilty to federal charges related to their illegal sale of the unapproved medical devices.

In January 2000, government agents observed Gabino Palafox, as he attempted to pick up mail held for Astropulse at a commercial mail receiving agency, where his name did not appear on the box. The agents observed him coming and going from Folsom's residence, as well as traveling to various commercial mail receiving agencies and post offices, picking up mail and shipping packages. Palafox was also observed traveling to Price Self Storage, and to various banks.

//

1  On April 2, 2003, federal agents executed search warrants at the residences of Folsom and Palafox, as well as the self storage location and the vehicle utilized by Palafox in making his pick-ups and deliveries. While several individual devices were found at the homes of Folsom and Palafox, and some boxed units were in Palafox's vehicle, over 400 devices were found in the storage unit, as were accessories, promotional literature and videos. The unit was rented in the name of Tomas Sanchez, who provided a Florida driver's license and a non-existent address in San Diego. The transaction history for the unit showed the address for Tomas Sanchez to be P.O. Box 457, 2260 El Cajon Blvd., San Diego, California, which is a postal mail box utilized by Palafox and Folsom for Naturetronics and Astropulse. The 400+ devices in the storage facility were boxed and ready for shipment, with brochures, manuals, and cables inside with the device. A device obtained during the execution of the warrants from each location searched was sent to the FDA for analysis.

Also discovered in the storage unit was a letter from the FDA, dated November 28, 2000, to Jim Anderson, President Services Support, Inc. of Merritt Island, Florida. The letter advised Anderson that the FDA had discovered a "serious regulatory problem involving Rife Technology products which are made and marketed by your firm." The letter advised Anderson that he was marketing the products in violation of law because he had not obtained marketing approval, making their products adulterated and misbranded. Services Support is a company incorporated in Merritt Island, Florida by Dr. Stanley Wellington and Lori Wellington. Folsom was a partner with Wellington in a Nevada corporation known as Wave Systems.

In Folsom's house, he had a copy of the FDA regulations regarding devices, marked with an arrow pointing to 21 C.F.R. § 805.65, entitled "exemptions for device establishments," and arrows pointing to subsection (d), which covers "licensed practitioners, including physicians, dentist, and optometrists, who manufacture or otherwise alter devices solely for use in their practice" and subsection (f), covering "persons who manufacture, prepare, propagate, compound or process devices solely for use in research, teaching and analysis and do not introduce such devices into commercial distribution." Also found was a document entitled "FDA 'Don't Panic' Sheet," It provides instructions on what to do if FDA inspectors arrive, including asking for forms FD-200, FD-482 and telling them they cannot take photographs.

There was also a facsimile from Jim Folsom to Gary Wade, dated March 3, 2003, in which Folsom asked permission to use his "Physicist Overview" that concerned "the technical aspects relating to working and frequency effects of the Janet Fleming/Kim Bailey-Bruce Perlowin instruments, ie BioSolutions/Global Wellness, Energy Wellness, etc." Also found was a copy of the press release from the U.S. Attorney's Office for the Southern District of California (July 29, 2002), announcing the guilty pleas of Mark Adams and John Krueger to felony charges related to the sale of the devices, which states that the FDA has not approved any biofrequency device for the treatment of disease in humans.

The search of Folsom's residence uncovered a business card for Jim Folsom of NatureTronics/Astropulse, Rife-Wellness Technology, "patented, versatile, user-friendly," with the address of 2260 El Cajon Blvd., #457 and the phone number of 858-650-1373, as well as the mention of several website addresses. Labels were also found in the names "Energy Wellness" and NatureTronics." Both bore the telephone number 858-650-1373. Also found at Folsom's home were letters typed to clients with the typed signature of "Jim Anderson" of NatureTronic, with the same address and phone number of the Folsom business card.

One such letter, for example, advises that the BioSolutions Model E Frequency Generator is the most advanced on the market. "Every frequency included has been extensively tested (7 years or more in animal and clinical trials). Nevertheless, now you can legally order and use the Model E, as long as you use it for your personal investigation of the effects of bio-active frequencies." The letter offers a 30-day money back guarantee and asks the client to call 858-650-1373 for more information.

In the vehicle driven by Palafox were found numerous receipts for mailings. There were also numerous drop ship requests and copies of checks from Doug Eschenberg of North Carolina, requesting that devices be shipped to various customers. Additionally, there was an agreement, signed by Bruce Perlowin and dated April 23, 2001, agreeing to sell all Energy Wellness frequency instruments of the model currently being marketed to Jim Folsom and Gabino Palafox for $1,000 apiece. The vehicle also contained a handwritten cash ledger, showing payments received, inventory and repairs, apparently in Palafox's hand, and a document signed by James M. Folsom of NatureTronics, directing Paine Webber to "cut a check for the balance of my account, $29,427.12" payable to "Gambio Palafox," dated February 27, 2003.

5

Mike Crowe, of MicroElectronics, supplied devices to Palafox and Folsom, first when they were associated with Bailey and then later after Bailey was no longer involved. Crowe sold them the devices with no labeling whatsoever. Crowe believed that they would add stickers with their own serial numbers, as he sometimes received the units back for repairs. Crowe sold them approximately 1,500 devices per year during the period from 2000-2007, when they were not associated with Bailey, at prices ranging from $230-300 each, under the names BioSolutions and then Global Wellness, and one special order of about 50 with the name Miracle Six. Crowe did not complete the device, but manufactured the "motherboard" and provided the case, the motherboard, the liquid crystal display, the keypad and the screws necessary for final assembly to Folsom and Palafox. Crowe delivered the devices in plain white boxes specially fitted with foam inserts for the devices and their components. Crowe supplied the cylinders used as components but not the cables that connect them to the device and did not supply the AC adapter used to plug the device into a wall socket. Crowe manufactured all the motherboards and devices pursuant to the patent of Bailey. The differences between the models were based on certain parts becoming obsolete and the need to replace them.

The FDA reviewed the devices and their literature and analyzed the operation of the devices themselves. The FDA determined that even though the literature included disclaimers, the machines were nonetheless medical devices within the meaning of the Food, Drug and Cosmetic Act. The FDA further determined that an approved application for investigational device exemption would be required if a Rife instrument was intended for clinical investigations with human subjects. The FDA further determined that an approved application for premarket approval would be required before a Rife instrument can be commercially distributed for the cure, mitigation, treatment or prevention of disease in humans because the device has not be determined by the FDA to be substantially equivalent to a medical device legally in commercial distribution in the United States on or before May 28, 1976, when the Medical Device Amendments of 1976 were added. The manuals themselves state that "in order to reduce cost, FDA approval has not been applied for." They announce that "No intent is made to diagnose, treat, cure or prevent any disease, disorder, pain, injury, deformity or physical or mental condition" and "This manual is for frequency instrument investigation, research and experimental use only."

A search of FDA records revealed no approved applications for premarket approval, no investigational device exemptions and no premarket notifications (of substantial equivalence) for any Rife instrument, and no registration of the company or its manufacturing facility. Moreover, there was no record of any application for premarket approval, premarket notification, or investigational device exemption for Folsom or the companies with which he is associated (Astropulse, NatureTronics, BioSolutions, Global Wellness, Energy Wellness, Wave Systems). The FDA deemed the devices to be adulterated because they were class III devices and did not possess an approved application for premarket approval or for investigational device exemption. The FDA further deemed the devices to be misbranded because notice and information required by the FDA were not provided.

The analysts determined that the devices would never gain FDA approval in their current form because the cables that connect the plates and cylinders to the devices (and thereby connect the device to the patient) are capable of being plugged directly into an ordinary wall socket, in violation of a specific FDA regulation establishing performance standards for patient cables intended for use with medical devices. 21 C.F.R. § 898.12. Such devices are deemed unsafe and cannot be approved in such form.

The analysts noted that the devices were misbranded in that they did not bear the name and place of business of the manufacturer, and if used as an investigational device, did not bear labeling with the required language in the regulations, stating: "CAUTION - Investigational device, limited by United States law to investigational uses."

A review of the financial records of accounts into which customer checks were deposited indicates total deposits of several million dollars from late 1998 to March 2005. Many of the checks were made out to "Jim Anderson." All of the endorsements of "Jim Anderson" appear to be in the handwriting of Folsom. Some of the "Jim Anderson" checks were deposited into accounts in the name of Folsom, while others were deposited into accounts in the name of Palafox. One distributor alone provided records documenting purchases of over $2 million worth of devices from Folsom over the period of their relationship, with the last shipment occurring in March 2008.

The names and addresses of customers were found on the deposited checks, as well as some of the correspondence found at the time of the search, and the records obtained from the distributors.

Folsom's "distributors" all agreed that no informed consent forms were signed by the end users and no records of effects of the device on the individual users were kept, except when the occasional testimonial letter was received. Those who received the devices from Folsom and shipped them to the customers provided no information whatsoever on the customers to Folsom. Those who had Folsom "drop ship" the devices from San Diego to the ultimate user often kept no records themselves of the names of the customers, but only of their payments to Folsom. None had any invoices sent by Folsom, although some created purchase orders they maintained for their own records (but did not send to Folsom). Several of the distributors knew Folsom as "Jim Anderson" until he revealed his true identity later. Folsom told one distributor that he used the name because he had been raided by the FDA and was trying to "fly under the radar." Most of the distributors were aware of the fact that the FDA had executed a search warrant at Folsom's residence in 2003. Folsom told them that hundreds of devices from his inventory had been seized. Folsom, however, never told any of them that he had been charged with selling an unapproved medical device or that he had received a warning letter to that effect from the FDA.

### III

### MEMORANDUM OF POINTS AND AUTHORITIES

A. THE GOVERNMENT HAS AND WILL CONTINUE TO COMPLY WITH RULE 16 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE. ANY ADDITIONAL DISCOVERY DEMANDS OF THE DEFENDANT SHOULD BE DENIED

The Government has already produced approximately 4,538 pages of discovery. On November 9, 2007, the initial 521 pages of discovery were made available. Defense counsel was advised in writing that additional discovery was available for his review at the office of the FDA in San Clemente, and he was provided with an address and telephone number to obtain access. The additional discovery consisted of items and documents seized during the execution of the search warrants in the case, as well as documents obtained through the use of grand jury subpoena (primarily bank records and records from vendors). On May 1, 2008, after the return of the Indictment in the instant case, an additional 3,559 pages of discovery were made available. Thereafter, additional discovery was provided as it became available. The Government continues to offer defense counsel access to the documents

1  held in evidence at the FDA, although to date defense counsel has not yet made an appointment to
2  review them. The letters from government counsel to the defense, offering access to the records, are
3  attached hereto as Exhibit 1.

4  Any additional discovery that comes to light will be produced as it becomes available. The
5  discovery produced is in excess of that required by Rule 16 of the Federal Rules of Criminal Procedure.
6  The gwill continue to comply with the rules concerning discovery. The defendant's specific requests
7  are discussed below.

        1.     The Government Has Already Disclosed Information
              Subject to Disclosure Under Rule 16(a)(1)(A) and (B)
              of the Federal Rules of Criminal Procedure

10  The Government has already disclosed all relevant written and recorded statements of the
11  defendant as well as the substance of any relevant oral statements of the defendant made in response to
12  questions by government agents. The defendant is not entitled to summaries of oral statements of the
13  defendant made to persons not known by him to be government agents, and the memorialization of any
14  such statements in a written report does not make them discoverable as "written" statements of the
15  defendant. United States v. Hoffman, 794 F.2d 1429, 1432, n.4 (9th Cir.1986).

        2.     The Government Has Complied and Will
              Continue to Comply With Rule 16(a)(1)(D)

18  The Government has already provided the defendant with a copy of his record of prior
19  convictions. Because the defendant appeared with defense counsel in court pursuant to a Notice to
20  Appear, no arrest reports exist, nor do any audio or video tapes related to his arrest, as requested by
21  defense counsel.

22  The Government is well aware of and will fully perform its duty under Brady v. Maryland, 373
23  U.S. 83 (1963) and United States v. Agurs, 427 U.S. 97 (1976), to disclose exculpatory evidence within
24  its possession that is material to the issue of guilt or punishment, as well as its duty under Giglio v.
25  United States, 405 U.S. 150 (1972) to provide information on any benefits provided to government
26  witnesses in exchange for their testimony.

27  //
28  //

9

1  //

        3.       The Government Has Complied and Will
                 Continue to Comply With Rule 16(a)(1)(E)

The Government will permit the defendant to inspect and copy or photograph all books, papers, documents, photographs, tangible objects, buildings, or places, or portions thereof, which are within the possession, custody, or control of the Government, and which are material to the preparation of the defendant's defense or are intended for use by the Government as evidence-in-chief at trial or were obtained from or belong to the defendant, and agrees to preserve such evidence during the pendency of this proceeding. The Government has offered access to such evidence to the defense, in writing, since November 14, 2007, but the defense has not yet attempted to schedule a date to review the evidence.

The defendant is not entitled to all evidence known or believed to exist which is, or may be favorable to the accused, or which pertains to the credibility of the Government's case. As stated in United States v. Gardner, 611 F.2d 770 (9th Cir. 1980), it must be noted that:

> [T]he prosecution does not have a constitutional duty to disclose every bit of information that might affect the jury's decision; it need only disclose information favorable to the defense that meets the appropriate standard of materiality.

Id., 611 F.2d at 774-775 (citations omitted). See also United States v. Sukumolachan, 610 F.2d 685, 687 (9th Cir. 1980) (the Government not required to create exculpatory material that does not exist); United States v. Flores, 540 F.2d 432, 438 (9th Cir. 1976) (Brady does not create any pretrial discovery privileges not contained in the Federal Rules of Criminal Procedure).

        4.       The Government Has Complied and Will
                 Continue to Comply With Rule 16(a)(1)(F)

The Government will permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession of the Government, and by the exercise of due diligence may become known to the attorney for the Government and are material to the preparation of the defense or are intended for use by the Government as evidence-in-chief at the trial. The Government has already disclosed the results of examination of the devices by the FDA and the results of the handwriting analysis. Should additional test results become available, they will be disclosed at that time.

//

11

|   |   |
|---|---|
| 1 | 5.  The Government Has Complied and Will |
| 2 |     Continue to Comply With Rule 16(a)(1)(G) |

The Government has provided the reports of the expert witnesses from the FDA, summarizing their analysis of the devices and identifying the material upon which they relied in forming their opinions. The Government has also provided the report of the handwriting analyst, and his curriculum vitae. Should any other relevant reports become available, they will be disclosed at that time.

6. The Defendant is Not Entitled to the Disclosure of Witness Statements Prior to the Witness Testifying on Direct Examination at Trial

Production of these statements is governed by the Jencks Act, 18 U.S.C. § 3500, and need occur only after the witness testifies on direct examination. United States v. Taylor, 802 F.2d 1108, 1118 (9th Cir. 1986); United States v. Mills, 641 F.2d 785, 790 (9th Cir.), cert. denied, 454 U.S. 902 (1981). Indeed, even material believed to be exculpatory and therefore subject to disclosure under the Brady doctrine, if contained in a witness statement subject to the Jencks Act, need not be revealed until such time as the witness statement is disclosed under the Act. See United States v. Bernard, 623 F.2d 551, 556 (9th Cir. 1979). Further, the Government does reserve the right to withhold the statements of any particular witnesses it deems necessary until after they testify. Otherwise, the Government will disclose the statements of witnesses no later than five days prior to trial, provided that defense counsel has complied with his obligations under Federal Rules of Criminal Procedure 12.1, 12.2, 16 and 26.2, and provided that defense counsel will turn over all "reverse Jencks" statements at that time.

7. The Government Objects to the Full Production of Agents' Handwritten Notes at This Time

Although the Government has no objection to the preservation of agents' handwritten notes, the Government objects to defendant's request for full production for immediate examination and inspection. If, during any evidentiary proceeding, certain rough notes become relevant, these notes will be made available. Any notes taken by the Assistant U.S. Attorney may be subject to the work product doctrine.

Prior production of these notes is not necessary because they are not "statements" within the meaning of the Jencks Act unless they comprise both a substantially verbatim narrative of a witness'

1  assertions <u>and</u> they have been approved or adopted by the witness. <u>United States v. Spencer</u>, 618 F.2d
2  605, 606-607 (9th Cir. 1980); <u>see</u> <u>also</u> <u>United States v. Griffin</u>, 659 F.2d 932, 936-938 (9th Cir. 1981),
3  <u>cert. denied</u>, 456 U.S. 949 (1982).

4               8.     <u>Bias or Prejudice of Prospective Witnesses</u>

5     To the extent that it could be argued that any potential witness is biased or prejudiced against
6  the defendant, such evidence has been made available to the defendant..

7               9.     <u>Henthorn Material</u>

8     The Government will examine the personnel records of any Government personnel that will
9  testify at trial, and provide such  material as the defense may be entitled to receive under  <u>United</u>
10 <u>States v. Henthorn</u>, 931 F. 2d 29 (9th Cir. 1991).

11              10.    <u>Grand Jury Transcripts</u>

12    The defendant has requested a copy of the transcripts of the witnesses before the grand jury in
13 order to avoid delay at the time of trial.  The Government opposes this request and asks that this Court
14 deny his motion.

15    The defendant has not articulated any particularized and compelling need for these grand jury
16 transcripts.  The Supreme Court has recognized that the proper functioning of the grand jury system
17 requires the secrecy of the grand jury proceedings. <u>See</u> <u>United States v. Proctor & Gamble Co.</u>, 356
18 U.S. 677, 681 (1958). Grand jury transcripts may be disclosed "upon a showing that grounds may exist
19 for a motion to dismiss the indictment because of matters occurring before the grand jury." F.R.C.P.
20 6(e)(3)(E)(ii).  A party seeking such disclosure of the grand jury transcripts must demonstrate a
21 "particularized and compelling need" for the disclosure, and such a need may not be based upon mere
22 speculation. <u>See</u> <u>Conforte v. Commissioner of Internal Revenue</u>, 692 F.2d 587, 594 (9th Cir. 1982);
23 <u>United States v. Perez</u>, 67 F.3d 1371, 1381 (9th Cir. 1995) (left intact on rehearing en banc, 116 F.3d
24 840 (9th Cir. 1997) (citing <u>Dennis v. United States</u>, 382 U.S. 855, 870 (1966)); <u>United States v.</u>
25 <u>Walczak</u>, 783 F.2d 852, 857 (9th Cir. 1986). If the court were to grant the motion, based on the showing
26 of need demonstrated by the defendant in this case, all that would be needed for disclosure of any grand
27 jury material  would be a bare allegation, without factual basis, of the possibility that the transcripts
28 could be useful to prepare for the defense. Such a showing falls far short of what the court's have

1  //

determined to be required for a showing of "particularized need" for the disclosure of grand jury transcripts.

The United States Supreme Court, in the case of <u>Douglas Oil Co. v. Petrol Stops Northwest</u>, 441, U.S. 211, 222 (1979), set forth a standard for determining whether a request for the disclosure of grand jury transcripts should be granted, which include: (1) the disclosure will avoid a possible injustice; (2) the need for the disclosure is greater than the need for continued secrecy; (3) only relevant portions of the transcript are disclosed.

Here, the defendant summarily claims that a copy of the grand jury transcripts is needed to prepare the defense. The defendant has not identified any particular facts to support the claim, or reason why the disclosure should not proceed in the normal course pursuant to the Jencks Act. Such a motion is based on mere speculation and does not satisfy the stringent standard for the disclosure of grand jury materials, and should be denied.

          11.    <u>Potential 404(b) Evidence</u>

The Government has no objection to providing notice of the general nature of any potential evidence it may seek to admit under F.R.E. § 404(b) three weeks before trial.

    B.    <u>FURTHER MOTIONS CAN BE FILED IF BASED ON UNDISCLOSED EVIDENCE</u>

The Government does not object to the granting of leave to file additional motions provided the motions are based on newly discovered matter not already provided by the Government as discovery. The Government has made available all statements of the defendant, as well as all evidence seized in the execution of search warrants at the residence of the defendant and any co-conspirators, and all materials obtained through the use of grand jury subpoenas. Virtually all of this evidence has been available to the defense since November of 2007.

//
//
//
//
//
//

IV

<u>CONCLUSION</u>

On the basis of the foregoing, the Government respectfully requests that Defendant's Motions for Discovery be denied, to the extent that it is opposed by the Government.

DATED: June ____, 2008.

                                        Respectfully submitted,

                                        KAREN P. HEWITT
                                        United States Attorney

                                        <u>s/ Melanie K. Pierson</u>

                                        MELANIE K. PIERSON
                                        Assistant United States Attorney
                                        Attorneys for Plaintiff
                                        United States of America
                                        Melanie.Pierson@usdoj.gov

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 08CR1092-JAH |
| Plaintiff, ) | |
| v. ) | CERTIFICATE OF SERVICE |
| JAMES FOLSOM, ) | |
| Defendant. ) | |

IT IS HEREBY CERTIFIED THAT:

I, MELANIE K. PIERSON, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893. I am not a party to the above-entitled action. I have caused service of Government's Response in Opposition to Defendant's Motions for Discovery and to File Further Motions on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them:

**Carlos F. Negrete (cnegrete1@hotmail.com)**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 3, 2008.

s/ Melanie K. Pierson

MELANIE K. PIERSON
Assistant United States Attorney